# HAROLD GARRISON *v.* STATE OF MARYLAND

[No. 1128, September Term, 1974.]

*Decided October 3, 1975.*

258

The cause was argued before Powers, Gilbert and Melvin, JJ.

*Gerald A. Kroop, Assigned Public Defender,* for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Nathaniel Moorehead, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

Melvin, J., delivered the opinion of the Court. Powers and Gilbert, JJ., concur and Powers, J., filed a concurring opinion in which Gilbert, J., concurs at page 277 *infra.*

Following a non-jury trial in the Criminal Court of Baltimore, Harold Garrison, also known as "Truck", was convicted of the felony of unlawful possession of heroin in sufficient quantity to indicate an intent to distribute it. (Code Art. 27, § 286 (a) (1).

In this appeal the appellant contests the correctness of the

trial judge's denial, after an evidentiary hearing, of two pre-trial motions to suppress certain evidence. The evidence **sought** to be suppressed was ultimately introduced at the **trial** over appellant's timely objections. The basis for the pre-trial motions to suppress and the objections at trial was that the challenged evidence was obtained by the police as a result of their allegedly unlawful entry into and search of the apartment building where appellant was a tenant. In short, the appellant invokes the doctrine of the "fruit of the poisonous tree", claiming the alleged illegal entry and search to be the "poisonous tree" and the information gained and evidence found as a result thereof to be the "fruit" and therefore inadmissible against him under well-established exclusionary rules enunciated by the U. S. Supreme Court and thus binding upon the courts of this state. *Mapp v. Ohio*, 367 U. S. 643 (1961).

More specifically, appellant claims that the information gained by the alleged illegal police activity should not have been used to form the basis of a probable cause affidavit for a search and seizure warrant pertaining to the basement of the appellant's apartment building where, pursuant to the warrant, heroin was seized by the police and introduced as evidence at trial over appellant's timely objection, and that without this information there was no probable cause for the issuance of a warrant to search the basement. He therefore claims that the doctrine of the "fruit of the poisonous tree" bars as evidence against him not only the information gained by the police during the prior alleged illegal search but the tangible evidence (170 packets of heroin) subsequently found by the police as a result of that information.

In *Everhart v. State*, 274 Md. 459 (1975) the Court of Appeals, speaking through Judge O'Donnell, said at 479-80:

"In applying the criteria laid down by the Fourth Amendment and as established by the opinions of the United States Supreme Court applying that Amendment, as prescribed in *Kerr v. California*, 374 U. S. 23, 33-34, 83 S. Ct. 1623, 10 L.Ed.2d 726

(1963), we find that the holdings in *Silverthorne Lumber Co. v. United States, supra,* in *Nardone v. United States,* 308 U. S. 338, 60 S. Ct. 266, 84 L. Ed. 307 (1939), in *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), and in *Alderman v. United States,* 394 U. S. 165, 89 S. Ct. 961, 22 L.Ed.2d 176 (1969), as explicated in *Carter v. State, supra* [274 Md. 411], compel the conclusion that *if data set forth as a basis for the existence of probable cause in an application for a search warrant, was come upon or derived as a result of an illegal search and seizure, such primary illegality — in the absence of evidence of attenuation or a source independent of such 'taint' — precludes the use of such derivative evidence from being a valid basis for establishing the existence of probable cause, under the doctrine of the 'fruit of the poisonous tree.'* (Emphasis added)

As was stated by Mr. Justice White in writing for the majority in *Alderman v. United States, supra,* quoted with approval in *Carter v. State,* supra [at 435]:

'If the police make an unwarranted search of a house and seize tangible property belonging to third parties — even a transcript of a third-party conversation — the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment. *Nothing seen or found on the premises may legally form the basis for an arrest or search warrant* [Emphasis in original] *or for testimony at the homeowner's trial, since the prosecution would be using the fruits of a Fourth Amendment violation.'* " (Emphasis added)

The Court of Appeals further said in *Everhart, supra,* at 481-82:

> *"The doctrine of the 'fruit of the poisonous tree' extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search;* in its broadest sense it prohibits the prosecution from using in any manner, prejudicial to the accused, information derived from facts learned as a result of the unlawful acts of law enforcement agents. Once a defendant, with requisite standing, has timely and factually asserted that the challenged evidence was derived from information obtained in an unlawful search and seizure, the court must afford him an opportunity to explore in detail the circumstances under which the evidence was acquired; *if the defendant establishes that the evidence resulted from an unlawful search and seizure such evidence cannot be used at all unless the prosecution can convince the trial court that it had an independent origin or that the information gained in the unlawful search did not lead directly or indirectly to the discovery of the challenged evidence."* (Emphasis added)

At the evidentiary hearing afforded the appellant on his motions to suppress, the affidavit supporting the issuance of the search and seizure warrant was introduced. The affidavit in relevant part reads as follows:

> "Affidavit in support of a Search and Seizure warrant for the premises of: 839 Druid Park Lake Drive Apartment A1, described in this affidavit as a three story white multiple dwelling known as: Lake Side Apartments.
>
> Also in support for the person of: Harold Garrison N/male, O.O.B. 1/28/37, 6'0, 175 lbs. B. of I. 97-976, who is also known by the alias name, "TRUCK".

.Also in support for the basement of 839-841 Druid Park Lake Drive which is known by your affiants to contain Laundry facilities for the occupants of 839-841 Druid Park Lake Drive — Lake Side Apartments (basement also contains Large area which is gained entrance by a metal firedoor, with Lock on same.)"

---

"During the fourth week of June, 1973, your affiants received information from a reliable informant that Harold Garrison alias "Truck" was presently distributing bundles of heroin from 839 Druid Park Lake Drive Apt. A1. The informant further stated that he has been purchasing heroin from "Truck" for the past two weeks. The informant stated that he would call Truck 728-4568 (investigation revealed that 728-4568 was listed to: Virginia B. Garrison, 839 Druid Park Lake Drive Apt. A1.) and inform "Truck" that he was coming over to "Re-Up" (term meaning to resupply). The informant stated he would then enter 839 Druid Park Lake Drive (Lake Side Apts.), walk down a hallway and knock on the door with A1 written on the door.

"Truck" would then open the door (door does have additional locks) and escourt the informant to the kitchen where the informant would hand over to "Truck" the money. ("Truck" is selling bundles (20 tinfoil bags) for $250.00 which is wrapped in tinfoil) "Truck" would then leave the informant in the kitchen and leave the apartment with keys. After approximately 3 — 4 minutes "Truck" would return and give to the informant one bundle (20 tinfoil bags of heroin). The informant would then depart.

Again during the fourth week of June, 1973, your affiants placed the premises of 839 Druid Park Lake Drive under observations. After approximately one hour Harold Garrison was seen

parking a Blue Volkswagen Temp. Tags E81078. "Truck" then entered 839 Druid Park Lake Drive. All three of your affiants are familiar with "Truck".

And know him on sight.

Again during the 4th week of June 1973 your affiants contacted the informant who stated that "Truck" was continuing to sell bundles of heroin for $250.00 and employing the same method of distribution. The informant stated he knows this to be true for he had returned to 839 Druid Park Lake Drive Apt. A1 and purchased another bundle since he last talked to your affiants.

It was then agreed that a Controlled Purchase of Narcotics would be made from "Truck" *in order to attempt to find and locate "Truck's" hiding place for the heroin.* On June 30, 1973 your affiants along with the informant went to the area of the 800 Block Druid Park Lake Drive. Detective James Welsh then searched the informant and found him to be free of money, drugs and other items.

James Welsh then gave the informant $250.00 of departmental funds. At this time your 1st and Third officers (Det. T. West and R. Murrey) entered 839 Druid Park Lake Drive along with the informant. The informant was observed by both detectives to knock on apt. A1. The informant then entered apt. A1. After approximate two minutes, both detectives observed Harold Garrison alias "Truck" come out of apt. A1 and proceed to walk down the hall. *At this time both detectives positioned themselves in the basement behind the steps leading down to the basement. Both detectives then observed "Truck" entered the basement walk to the end and then produced a key to a metal fire-door. "Truck" then entered this large vacant room and both detectives lost sight of him. After approximately one minute*

*"Truck" reappeared and relocked the door. "Truck" then turned to exit the basement and at this time both detectives observed in "Truck's" right hand one tinfoil packet.* ( approximately the size of a egg) "Truck" then walked back up the stairs and was observed by both detectives to re-enter 839 Druid Park Lake Drive Apt. A1 ("Truck" opened the door to apt. A1 with a key).

After approximately two minutes the informant walked out of apt. A1 and walked directly to Detective James Welsh (followed by both detectives). The informant then gave to Detective James Welsh one tinfoil packet containing 20 smaller tinfoil packets of a white powder. The informant was again searched by Det. James Welsh and found to be free of money, drugs

And other items. The informant then stated to your affiants that he had entered apt. A1 and was again escourted to the kitchen where he gave to "Truck" $250.00. "Truck" then left the apartment and returned approximately 4 minutes later and gave to the informant one tinfoil packet with 20 smaller tinfoil packets. The informant then departed.

The suspected heroin was then field tested by Det. James Welsh (marquis test kit) and a positive reaction was obtained for a opiate-evidence submitted to crime lab for further chemical analysis by Det. James Welsh. C.C. # SF 67-36." (Emphasis added)

The affidavit was signed by the three Baltimore City police detectives mentioned in the affidavit, Detectives West, Murrey and Welsh. Other portions of the affidavit established the training and experience of the three detectives as well as the reliability of the unnamed informant. On presentation of the affidavit the District Court judge in Baltimore issued a warrant authorizing a search of 1) apartment A1, 2) the person of the appellant, and 3) the basement of 839-841 Druid Park Lake Drive.

Appellant does not dispute that based on the informant's information set out in the affidavit there was sufficient probable cause for the issuance of a warrant to search apartment A1 and the person of the appellant. However, he vigorously asserts the illegality of the warrant as to the basement, claiming as set forth, *infra*, that the probable cause for searching the basement was only obtained by means of the prior alleged illegal entry into the apartment building and its basement. The State does not dispute that indeed the only probable cause shown for a search of the basement was the observations made by detectives West and Murrey while they were, to use Detective Murrey's words, "secreted in the basement under the steps" at approximately 2:35 A. M. on June 30, 1973, some six hours before the warrant was obtained.

In executing the warrant the three detectives, at approximately 8:30 A. M. on June 30, 1973, went first to the basement and broke off the padlock on the fire door to the large empty room they had seen appellant enter at 2:35 A. M. that same date. In a corner of the room they found an electric cord "tied around one of the pipes and dropped down inside the wall". The other end of the cord, which was out of sight, was found to be tied to a lady's black hand bag containing 170 tin foil packets of heroin. This was the heroin introduced at the trial in chief over appellant's objection.[1] The officers then went to Apartment A1 and recovered "from Mr. Garrison's person . . . one key which fitted (sic) the padlock which secured" the basement room where the heroin had been found. No other inculpatory evidence was found in the apartment. Appellant was then placed under arrest and "charged with possession of heroin".

In addition to the affidavit, other evidence adduced at the pre-trial suppression hearing established that tenants in the apartment building had no permission to use the large

---

1. Although the trial judge allowed Detective Murrey to testify, over appellant's objections, concerning his observations of the "controlled buy", no attempt was made to introduce as evidence the "one tin foil packet" which the informant presumably obtained from appellant's apartment; nor was there any evidence at the trial in chief that the packet contained illicit drugs. The informant did not testify.

basement room where the heroin was found. On this evidence the trial judge ruled that when the appellant entered that room he became a trespasser and as such had no standing to claim his Fourth Amendment rights had been violated, even though the police may also have been trespassers when they entered the building and hid behind the basement steps to observe the appellant.

We think that in the particular circumstances of this case the appellant did have standing and that the trial judge was in error in not suppressing as evidence both the observations of the police detectives inside the apartment building and the tangible evidence found as a result thereof.

### Standing To Object to Police Observations

To determine properly the issue of standing it is necessary to describe more fully the layout of the apartment building. Evidence, including photographs and diagrams, at the suppression hearing showed that the building is a three story frame structure located at 839-841 Druid Park Lake Drive in Baltimore City. There is one front entrance to the building consisting of a solid single door 3 feet wide. No. 839 is the address of the apartments on the left hand side of the entrance and No. 841 the address of those on the right hand side. There are "approximately thirteen apartments" in the building. There are four apartments on the first floor.

The front door of the building opens into a small vestibule 8 feet wide and 5 feet deep. To reach the first floor apartments one must ascend 4 steps from the vestibule to a "1st floor landing", approximately 4 feet deep and 8 feet wide. One apartment opens directly onto the landing. The other three first floor apartments open onto a narrow hallway leading from the "1st floor landing" to the rear of the building. The hallway varies in width from 3-1/2 feet to 2 feet 8 inches. The door to appellant's apartment (A1) is at the rear of the hallway, a distance of 49 feet from the 1st floor landing.

The resident manager of the building testified that the entrance door to the building is kept locked and only the

tenants, the resident manager and building superintendent have keys to the door. Anyone visiting tenants would have to call the tenants by telephone from outside the building "and they would come down" and unlock the door. He further testified, however, that "if you had a key to the front door and came in and forgot to lock it back again then it would be unlocked".

Beside the steps leading from the vestibule to the 1st floor landing is a door leading to the basement. This door is also kept locked. It is the only access to the basement. Aside from the building superintendent and manager, only tenants have keys to this door. The tenants are issued keys so they can use the washing machines in the "laundry room" located in the basement. There is evidence that at the time of the suppression hearing (March 15, 1974), there was a sign on the basement door reading "Laundry Room, Open — 7:30 A. M., Closed — 9:30 P. M.". But there is no evidence that any such sign was posted on June 30, 1973, or that the appellant was ever told he could not enter the basement with his key after 9:30 P. M.

In addition to the laundry room there are two or three other rooms in the basement. The doors to these other rooms were kept locked and no tenants were permitted in them. The entrance to one of these rooms is through a metal fire door. On June 30, 1973, the door was locked with a padlock. The maintenance superintendent testified that he put a keeper on the door in May or June, 1973, because "they had to buy a lock because they had trouble before with some people". The record is silent as to who "they" are. The witness further said he did not put the padlock on the door and did not know who did. It was this large empty room, 18 feet by 47 feet, that Detectives Murrey and West observed appellant enter at 2:35 A. M. on June 30, 1973, and from which they saw him emerge carrying a tinfoil packet the size of "a (sic) egg".

It is evident that the trial judge believed that the appellant, having a key to the basement, had a right to be in the basement but no right to go through the metal fire door into the large empty room. In ruling on the motion to

suppress, the trial judge said: "And, so, in effect, he came through an area [where the laundry room was located] in which he had a right to be, and went into an area [the back room], at the very least, he had . . . as little right as anybody had to be . . .". The evidence supports this finding. Unfortunately, however, it does not support the conclusion that the appellant lacked standing to contest the propriety of using the observations of the police as a basis for probable cause to search the back room or as evidence at trial over his objection.

When the two detectives observed the appellant in the basement he was in an area "in which he had a right to be"; then, according to the affidavit and the testimony at the trial in chief, they saw him enter "this large vacant room and both detectives lost sight of him". They did not see him while he was in the back room. When they saw him emerge from the room a minute later, he was back in an area where the trial judge found he had a right to be. At this point the detectives observed that he had the egg-sized tinfoil packet.

In a recent opinion by Judge Moylan, this Court reviewed the development of the law of standing to object to a search and seizure. See *Duncan v. State*, 27 Md. App. 302 (1975). Initially the first hurdle a defendant must overcome at a suppression hearing is that of producing evidence that his personal constitutional rights were violated.[2] "One must establish that it is *his own* direct or derivative enjoyment of property or expectation of privacy that has been invaded before he may challenge the invasion". *Duncan v. State, supra,* at 304.

Prior to the Supreme Court decision in *Jones v. U. S.*, 362 U. S. 257 (1960), many lower courts required a defendant to prove that he had either a possessory interest in the premises searched or the object seized. (*See e.g. Gaskins v. U. S.*, 95 U. S. App. D. C. 34; *Connolly v. Medalie*, 58 F. 2d 629; *U. S. v. DeBousi*, 32 F. 2d 902). Thus a mere guest or invitee prior to *Jones* was generally regarded as not

---

**2.** There is some indication that before a defendant is required to offer such proof the State must raise the issue of defendant's lack of standing. Combs v. U. S., 408 U. S. 224 (1972). The State has sufficiently raised the issue in the case at hand.

having sufficient interest in the premises to object to the search. In rejecting the necessity of proving ownership or possessory interest as a prerequisite to challenging the legality of a search and seizure, the Supreme Court said, in *Jones*, at 267:

> "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that *anyone legitimately on the premises where a search occurs may challenge its legality by way of a motion to suppress when its fruits are proposed to be used against him.* This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." (Emphasis added).

At the time the appellant was observed in the basement at 2:35 A. M. he was, as the trial court held, "in a place he had a right to be", *i.e.*, he was "legitimately on the premises", in an area common to all tenants, but excluded to the public in general. The fact that a person does not have exclusive use or is not the only person who is legitimately on the premises is not a bar to his having standing to object to a search of that area. In *Mancusi v. De Forte*, 392 U. S. 364 (1968), the U. S. Supreme Court held that a union official had standing to object to a search of the offices where he worked even though it was an office shared by several union officials and even though the defendant did *not* claim the records were seized from an area set aside for his personal use. The Court relied on *Jones, supra,* and *Katz v. U. S.*, 389 U. S. 347 (1967), and held that the capacity to claim the protection of the Fourth Amendment "depends not upon a property right in the invaded place, but upon whether the area was one in which there was a reasonable expectation of freedom from government intrusion." 392 U. S. at 368.

In the circumstances, we hold that while the appellant was in the basement, except for the time he was in the large empty room, he had a reasonable expectation that he would be "free from governmental intrusion". The expectation was

"reasonable" because he was "legitimately on the premises", with knowledge that the area was excluded from the public's presence and sight. Appellant met his burden of establishing his standing to object to the warrantless intrusion into the basement area.

### Reasonableness of Prior Search

The appellant having established standing, the burden then fell upon the State to show justification for the warrantless search at 2:35 A. M. of the apartment basement. The trial judge made no finding on this issue for, as an alternate ground for denying the suppression motions, he was of the opinion that, based on *U. S. v. Calandra*, 414 U. S. 338, "if the 'Fruit of the Poisonous Tree' doctrine does not affect the evidence which appears before the grand jury, which is a later proceeding than the proceeding for the issuance of a search and seizure warrant, then . . . logically the conclusion ought to be it ought not apply as well to the issuance of the warrant either".[3] He then remarked, ". . . [T]his evidence may or may not have been illegally obtained". Having ruled that the poisonous tree doctrine did not apply in testing the search warrant's validity, it was not necessary for him to determine the issue of primary taint at the pre-trial suppression hearing, regardless of whether the appellant had standing or not.

The question is whether we as an appellate court should undertake the task of determining the validity of the prior search when the trial court has not. In *Walters v. State*, 8 Md. App. 583 (1970), Chief Judge Orth said at 588, n. 5:

"This Court does not sit as in *nisi prius* to appraise contradictory factual questions. This does not mean, however, that we may not, where necessary to the determination of constitutional rights, make an independent examination of the facts, findings and record so that we can determine

---

3. The trial judge, of course, did not have the benefit of the recent Court of Appeals decision in Everhart v. State, supra, holding to the contrary.

whether in the decision as to reasonableness of a search the constitutional criteria have been respected."

In the case before us the record reveals no unresolved factual disputes surrounding the prior entry and search by the police. In the circumstances we think it appropriate to make an independent examination of the record and determine for ourselves the reasonableness thereof. We have done so. We hold that the prior entry and search were unreasonable under the circumstances.

The record is clear that the police entered the apartment building at 2:35 A. M. for the sole purpose of "attempt[ing] to find and locate 'Truck's' hiding place for the heroin". The police admitted they had no permission to enter the building or, once inside, to enter the basement of the building. Detective Murrey testified that when he and Detective West entered the front door it was unlocked. However, unlike the situation in *Eisenstein v. State,* 200 Md. 593 (1952), there is no evidence from which the police could have reasonably concluded that the building or its common hallways were open to the public at 2:35 A. M.

In *Eisenstein,* police officers, without a search warrant, opened the unlocked entrance door and entered the vestibule of a small apartment house. They were looking for a person named Drake they suspected of violation of the narcotic laws. While in the vestibule they observed Eisenstein come out of a door "shoving lottery tickets into his pocket". One of the officers grabbed Eisenstein and caught his hand in the pocket with the lottery slips and took 25 slips away from him. Eisenstein claimed his arrest and the seizure of the slips were illegal. The Court said, at 597: "If the officers were lawfully in the vestibule of the apartment house when they observed the appellant with the lottery tickets, although without a warrant, they had the right to arrest the appellant, search his person and seize incriminating articles connected with the crime found upon his person or within his use and immediate control or possession". There was no evidence in *Eisenstein* that the entrance door was ever

locked and other evidence that "it was the custom of everyone entering this apartment house to use this vestibule as a public entrance and that this unlocked entrance door was open to the public . . . . It could be concluded on the question of admissibility of this evidence [the lottery slips], that this vestibule was a public hallway". at 600.

The State produced no evidence warranting such a conclusion in the instant case. On the contrary, as noted earlier, there was uncontradicted testimony by the resident manager that the entrance door was kept locked and only tenants and management personnel had keys to the door. The only way one visiting a tenant could gain entrance was by telephoning a tenant who "would come down" and unlock the door. In their affidavit accompanying the search warrant application, the police officers swore that they entered the front door "along with the informant", who had previously informed them that on previous occasions he would telephone "Truck" and inform him "he was coming over to 'Re-Up' (term meaning to resupply)"; and that "he would then enter 839 Druid Park Lake Drive (Lake Side Apts.), walk down a hallway and knock on the door with A1 written on the door" (See affidavit set forth *supra*). This is consistent with the resident manager's testimony and supports the clear inference that in the early morning hours of June 30, 1973, the appellant, in response to the informant's telephone call, unlocked the door for him and returned to his apartment to await the informant's arrival.

. At the trial in chief Detective Murrey testified that it was he or Detective West, rather than the informant, who actually opened the door by turning the knob and walking in. In our opinion, under the circumstances, this was an illegal entry on their part for the expressed purpose of searching for evidence of crime against the appellant.

It may be that at the time of their initial entry, based on the information from the informant concerning appellant's method of operation, the police had probable cause to search the apartment building, including perhaps the basement, but as stated by the Supreme Court in *Katz v. United States, supra,* at 356-57:

". . . [T]his Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' *Agnello v. United States,* 269 U. S. 20, 33, for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . .' *Wong Sun v. United States,* 371 U. S. 471, 481-482. 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' *United States v. Jeffers,* 342 U. S. 48, 51, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions."

There is no evidence in this case warranting the application of any of the "few specially established and well-delineated exceptions" to the warrant rule. Certainly, there were no exigent circumstances. The affidavit on its face establishes that the appellant had been under surveillance for several days. There was no evident reason for not seeking a warrant before the initial entry into the building.

In his concurring opinion in *McDonald v. United States,* 335 U. S. 451, 458 (1948), Mr. Justice Jackson said:

"But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry. Here

the police gained access to their peeking post by means that were not merely unauthorized but by means that were forbidden by law and denounced as criminal . . . . Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality. *Cf. Weeks v. United States*, 232 U. S. 383; *Taylor v. United States*, 286 U. S. 1; *Johnson v. United States*, 333 U. S. 10."

Even if we were to assume the initial entry into the building was somehow lawful, there can be no doubt that the entry into the basement was not. Here again, the police concede they had no permission from anyone to enter the basement. There are cases, such as *Eisenstein, supra,* where courts have held it reasonable in certain circumstances for police officers to enter lobbys and common hallways of apartment buildings found to be used by the general public. No case has been cited to us and we have found none, holding that, absent consent or exigent circumstances, the police may make a warrantless search of a basement area closed to the public and to be used only by tenants of the building.

From what we have said it follows that evidence concerning the observations of the police inside the apartment building in the early morning hours of June 30, 1973, should not have been admitted as evidence at the trial in chief or used to form the basis for the search warrant subsequently obtained. *See Alderman v. U. S.,* 394 U. S. 165 (1969); *Everhart v. State,* supra; *Carter v. State,* 274 Md. 411 (1975).

## ADMISSIBILITY OF TANGIBLE EVIDENCE (HEROIN)

The State argues that even if the search warrant is held invalid as to the basement, since the appellant "had no right to expect any privacy at all in the vacant room" where the

heroin was found by the police after they had obtained the search warrant, the appellant had no standing to object to its admissibility. As we have indicated, the trial judge agreed with this contention. We do not. We think that once it has been established that appellant has standing to object to the police observations inside the building and once it is shown that those observations were the *direct* fruits of a violation of appellant's Fourth Amendment rights, the appellant's right to object to evidence *indirectly* obtained as a result of that violation is also established.

Stated differently, once it is determined that a defendant in a criminal trial has standing to object to evidence obtained as a *direct* result of violations of his Fourth Amendment rights, his standing to object to evidence obtained as an *indirect* result of those violations derives from the prior establishment of his standing to object to the evidence *directly* obtained. We think this result is mandated by decisions of the Supreme Court of the United States (See, e.g. *Silverthorne Lumber Company v. United States,* 251 U. S. 385 (1920); *Nardone v. United States,* 308 U. S. 338 (1939); *Wong Sun v. United States,* 371 U. S. 471 (1963)), as explicated by the Maryland Court of Appeals in *Everhart v. State, supra,* and *Carter v. State, supra.*

In *Wong Sun,* the Supreme Court brought to full flower the doctrine of the "fruit of the poisonous tree". In that case there were two defendants, Toy and Wong Sun, both charged with narcotic violations. Both had been illegally arrested by federal narcotics agents. A verbal statement by Toy given to the agents immediately after his arrest was held inadmissible against Toy (as "the 'fruit' of official illegality"). The verbal statement directed the police to a third person, Johnny Yee, as one who was selling narcotics. The police thereupon went to Yee's home, entered it and found Yee in his bedroom. After a discussion with the agents, Yee took from a bureau drawer a small quantity of heroin and surrendered it to the agents. One of the questions before the Supreme Court was the admissibility of this heroin in evidence against *both* Toy and Wong Sun. As to Wong Sun the Court held the heroin admissible, as "[t]he

seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial". It is clear to us that, considered in *vacuo*, the same could be said as to its admissibility against Toy. Toy had no more right of privacy in Yee's home than did Wong Sun. As to Toy, however, the Court said, at 487, 488, 492:

"We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that 'we wouldn't have found those drugs except that Mr. Toy helped us to.' Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence 'from an independent source,' *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' *Nardone v. United States,* 308 U. S. 338, 341. We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. *Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'* Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were 'come at by the exploitation of that illegality' and hence that they may not be used against Toy." (Emphasis added)

"... The exclusion of the narcotics as to Toy was

required *solely* by their tainted relationship to information unlawfully obtained from Toy, and not with any official impropriety connected with their surrender by Yee". (Emphasis added)

On the record before us, we think it clear that the heroin with which the defendant was charged with possessing was "come at by exploitation" of the primary illegality and that the State failed to produce legally sufficient evidence that "it had an independent origin or that the information gained in the unlawful search did not lead directly or indirectly" to its discovery. *Everhart v. State,* supra.

> *Judgment reversed and case remanded for a new trial.*
> *Costs to be paid by Mayor & City Council of Baltimore City.*

*Powers, J., concurring:*

Judge Gilbert and I subscribe fully to the opinion written for the unanimous panel by Judge Melvin, as well as in the result. I wish, however, to comment further upon the effect of the illegal 2:35 A. M. search upon appellant's constitutional rights. Judge Gilbert joins me in this comment.

It should be clear that we are not holding that the appellant had Fourth Amendment standing to object to the second entry and ultimate seizure at 8:30 A.M. as such. He clearly did not. His standing rather was to object to the indirect use as well as the direct use of information gathered during the earlier 2:35 A.M. intrusion, as to which he did most definitely have Fourth Amendment standing. That earlier unconstitutional intrusion was the poisonous tree — primary illegality. I wish to emphasize precisely which of several parallel but functionally distinct uses of the information unconstitutionally obtained at 2:35 A.M. — precisely which exploitation of that primary illegality — is the one that counts in this case. Poisonous trees may bear

immaterial fruits as well as material ones and may bear both simultaneously.

It was not the use of the unconstitutionally obtained evidence to spell out probable cause for the search warrant that matters here. Since the appellant has no Fourth Amendment protection in the inner room searched at 8:30 A.M., no search warrant, as far as his rights were concerned, was necessary. The very existence of a warrant being immaterial, the constitutional validity of its probable cause is thereby equally immaterial. It simply does not matter whether probable cause is tainted or untainted for a warrant which is itself redundant.

The exploitation of the primary illegality that does matter was the use of the unconstitutionally obtained information to know when and where to go and where to look at 8:30 A.M., irrespective of any Fourth Amendment consideration at that later time. On the record before us, but for the use of the illegally obtained knowledge, the contraband would never have been found. There was no arguable attenuation of the taint. The precise use of a poisoned fruit which cannot be permitted, therefore, was not the obtaining of an unneeded warrant, an immaterial exploitation at most, but the very act of going to an unforseeable hiding place in the sure knowledge that contraband would there be found, a most material and directly incriminating exploitation. It was not the ostensible justification for the going to the landlord's basement room but the very act of going to that room that mattered.