RAYFIELD ZEKE WILSON *v.* STATE OF MARYLAND

[No. 513, September Term, 1975.]

*Decided February 3, 1976.*

The cause was submitted on briefs to MOYLAN, DAVIDSON and LOWE, JJ.

Submitted by *Donna Aldridge, Assigned Public Defender,* for appellant.

Submitted by *Francis B. Burch, Attorney General, Bernard A. Raum, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Arthur Kravetz, Assistant State's Attorney for Prince George's County,* for appellee.

LOWE, J., delivered the opinion of the Court.

Stemming from the intial abhorrence of the "general warrant" felt by the colonists, there has been so much written on the subject of the Fourth Amendment "right of the people to be secure in their ... homes ... against unreasonable searches and seizures ...," that it is hard to believe there yet exists a circumstance untreated somewhere in our appellate reports. We look forward to the time when we may affirm or reverse by mere recitation of authority to one or more cases of identical factual context, much in the manner of comedians who amuse one another by numerical reference to a joke index, avoiding the tedium of repetitive verbiage. While we are aware of the enormous force of *few* words, it is as yet beyond our ken to articulate briefly the reasons for our holdings while clearly limiting them lest they be misapplied in another case, yet we will try once again.

Rayfield Zeke Wilson was convicted by a jury of the Circuit Court for Prince George's County of receiving stolen goods. Crucial to his conviction was the introduction of a cassette recorder recovered by police from his residence. The room occupied by Wilson as his residence was searched by

federal agents who were accompanied by a Prince George's County officer (who was there as a "back-up to the Feds"). The subject of the search was restricted by a valid warrant to narcotics and narcotics paraphernalia. No narcotics or paraphernalia were found. During the course of the search, the attention of the county officer was caught by a quantity of stereophonic equipment. His decision to make a list of the serial numbers of those items is at the heart of this appeal.

"Q. Officer, did there come a time when you were there that you had occasion to observe some electronic equipment, stereo equipment?

A. Yes, sir.

Q. And what, if anything, did you do upon observing those items? Could you describe the items that you observed and what, if anything, you did upon observing them?

A. Well, I can't describe them exactly. There were various t.v. sets, stereo equipment, speakers, one or two clock radios, camera and various items in the house that I looked over and jotted down the serial numbers of all of them.

Q. And approximately how many items were there?

A. Somewhere around twenty, twenty-five.

Q. And where in the house did you observe those items?

A. In the upstairs bedroom.

Q. And what did you do with the serial numbers that you jotted down?

A. When I got the serial numbers jotted down I attempted to contact or teletype to S.I.I. to get an N.C.I.C. telecheck.

Q. What do you mean by that?

A. National Computer, where any type of anything stolen, the serial numbers are entered into it and all these serial numbers are on file in this computer."

Appellant objected to succeeding questions which sought

to elicit what the submission of the serial numbers to the computer disclosed. While pointing out that the objection may have been somewhat premature, the court sequestered the jury and permitted appellant to proceed as if the objection were a motion to suppress. It became clear during the hearing that appellant was attempting to preclude the State from introducing into evidence a cassette recorder which was seized by a Prince George's County detective the day following the narcotics search. Continuing its examination of the county officer, the State sought to justify the seizure by eliciting the fact that appellant consented thereto:

> "Q. How did the policeman get it or how did the county get it?
>
> A. The Detective Shapiro went back later.
>
> Q. With a Search Warrant?
>
> A. No, without a Search Warrant.
>
> Q. Was it consented to?
>
> A. Yes.
>
> Q. In other words he took physical possession of this Sony cassette recorder by consent of the accused?
>
> A. That is correct."

The appellant, on the other hand, argued that the

> " . . . information originally taken from his house was taken illegally. The cases are clear that if you are in a home looking for television sets, you can't look for narcotics and [i]n this case they were looking for narcotics and didn't find any narcotics and my contention is that at that point the warrant is dead. Surely they can see the items, but not the serial numbers and information. They had to move them around to get that, so it doesn't fall within that."

Presumably what appellant contended was that the circumstances surrounding the consent were tainted by an

illegal search and, as a consequence, the consent was not voluntary. In *Schneckloth v. Bustamonte,* 412 U. S. 218, 227, the Supreme Court made it clear that, while consent to search supplanted the need to obtain a warrant, such consent must be voluntary and

> " . . . whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."

Perhaps because the evidentiary question was somewhat premature, as the judge below pointed out, the "circumstances" giving rise to the consent were not before him when he ruled upon the admissibility of the cassette. However, by not responding to appellant's contention that the wrongful search tainted the subsequent seizure, he seemed to rule implicitly either that the subsequent consent absolved the wrongful search, or that the initial search was a valid offshoot of the federal warrant. He said:

> "My ruling is, that you told me that this item was seized by the consent of your client, therefore it is admissible. Bring the jury back. I don't have to pass on the other question."

The unanswered "other question" was obviously whether it was proper for the county police officer to make a list of the serial numbers of the electronic equipment in order to determine if any of the articles had been stolen. As a result of the officer's action, one of the items was determined to have been stolen — a cassette tape recorder, and was subsequently seized. It was not until after his ruling on the legality of the seizure, however, that the judge heard the details of the computer report.

> "A. I got a reply — well, the teletype operator got a reply from the N.C.I.C. operator.
>
> BY MR. NOBLITT: Objection for the record.
>
> BY THE COURT: Overruled.

BY THE WITNESS: That one of the items was stolen.

Q. And which item was that?

A. It was a Sony cassette tape recorder."

Acting upon this information, a county detective went to appellant's residence the next day, without a warrant, and the following ensued:

"A. I approached the Defendant, advised him of his Constitutional rights and explained that the stolen property was observed and verified in his home the night before by the uniformed officer.

Q. Now, what rights specifically did you advise the Defendant of?

A. From my Waiver of Rights card I advised Mr. Wilson that 'You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before a statement is taken if you wish. If you decide to give a statement, you still have the right to stop at any time so that you may talk to a lawyer.' Then I asked him if he understood the rights I have explained to him and he acknowledged that he did.

Q. And what happened next?

A. I asked him if he would relinquish the property that was in his home, the cassette, Sony cassette tape player and I provided the serial number.

Q. And what did Mr. Wilson tell you in regard to that?

A. It was in his room and he led me up there.

BY THE COURT: He did what?

BY THE WITNESS: He led me up there.

. . .

Q. And did there come a time when you examined

the cassette that looks similar to the one that had previously been described to you?

A. I did.

Q. And what, if anything, did you observe about that cassette?

A. Well, the serial number of 30185 was affixed to the cassette player and matched to the one reported by the claimant in the break-in of his home in February.

Q. Now, who was the person that returned that cassette to you?

A. The Defendant.

Q. What, if anything, did you do after that?

A. The recovered stolen property and the Defendant were transported to Crimes Against Property, Oxen Hill."

Guided by the directive of *Schneckloth v. Bustamonte, supra,* we have looked at the circumstances of the consent to seize and, as in *Whitman v. State,* 25 Md. App. 428, 456, we find the atmosphere of the search and seizure critically suggestive of coerced consent.

It was made abundantly clear by Judge O'Donnell in *Everhart v. State,* 274 Md. 459, that, when information serving as a basis for probable cause was obtained or derived as a result of an illegal search, the doctrine of the "fruit of the poisonous tree" (set forth in *Wong Sun v. United States,* 371 U. S. 471 and held applicable to the states by *Brown v. Illinois,* 422 U. S. 590, 45 L.Ed.2d 416) applies to preclude the use of such information as the basis of a search warrant. Judge O'Donnell wrote:

"The doctrine of the 'fruit of the poisonous tree' extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search; in its broadest sense it prohibits the prosecution from using in any manner, prejudicial to the accused,

information derived from facts learned as a result of the unlawful acts of law enforcement agents. Once a defendant, with requisite standing, has timely and factually asserted that the challenged evidence was derived from information obtained in an unlawful search and seizure, the court must afford him an opportunity to explore in detail the circumstances under which the evidence was acquired; if the defendant establishes that the evidence resulted from an unlawful search and seizure such evidence cannot be used at all unless the prosecution can convince the trial court that it had an independent origin or that the information gained in the unlawful search did not lead directly or indirectly to the discovery of the challenged evidence." *Everhart v. State,* 274 Md. at 481-482.

The State first contends that, since there was no arrest until after appellant voluntarily relinquished the cassette recorder, the probable cause for appellant's arrest was not the "fruit" of the initial search. We view this argument as specious. Without the information obtained by the county police officer during the federal agents' search for narcotics, the encounter between the detective and appellant and appellant's subsequent consent to the seizure would never have occurred. Nor can the State justify a seizure and arrest on the basis of articles seized pursuant thereto as pointed out in *Johnson v. United States,* 333 U. S. 10, 17,

"This will not do. An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion."

We must, therefore, examine the validity of the initial search. The State attempts to justify the original search upon the doctrine of "plain view" set forth in *Coolidge v. New Hampshire,* 403 U. S. 443. This doctrine was discussed in depth in *Brown v. State,* 15 Md. App. 584, 603. Judge Moylan explained the doctrine in the words of the Supreme Court:

"In giving voice to the Frankfurter rationale, *Coolidge* stated, 'The 'plain view' doctrine would normally justify as well the seizure of other evidence that came to light during such an appropriately limited search. . . . Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.' "

Although *Brown* did not turn upon the "plain view" doctrine, but rather on what Judge Moylan termed "open view," we did acknowledge through *Brown* that we accepted the plurality opinion in *Coolidge*. *Coolidge* unequivocally condemns what was done here:

"Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge*, 403 U. S. at 466.

Just as the plain view doctrine will not justify the seizure of suspicious articles which are not obviously "evidence" of a crime, it also will not justify the copying of serial numbers from articles found on the premises, but unrelated to the object of the search, in order to determine later whether they are stolen goods. There would have been little difference in the result had the officer seized the items whose numbers he listed and later returned all but the one which his investigation revealed to have been stolen. It is not the subsequent seizure we find abhorrent, but rather the rummaging about as if under a general warrant, in hopes of finding something illicit. It was not "immediately apparent" to the officer that the goods he listed were stolen, even if their quantity did arouse suspicion. It was only when he

received the computer report that his suspicions were confirmed. In short, he had no probable cause to justify an indiscriminate seizure of all items that happen to be visually in plain view. *Cf. Dixon v. State,* 23 Md. App. 19, 31. Nor did the process of cataloguing serial numbers in any way coalesce with the search for narcotics permitted by the warrant, although the State argues otherwise:

> "Q. Now, did you observe whether or not the Federal Officers searched the particular bedroom to which you referred before?
>
> A. Not the whole time they were there. Right about the end, the last ten minutes I was in the bedroom, yes.
>
> Q. Was the bedroom searched by the officers?
>
> A. Yes.
>
> Q. And when they searched the bedroom, did they go into drawers or closets or whatever?
>
> A. Yes, they did.
>
> Q. And that was also done under the Search Warrant?
>
> A. Yes.
>
> Q. And where were these items you looked at?
>
> A. There were some sitting on top of the drawer, the dressers, on the floors.
>
> Q. The items that you took the serial numbers off of, could you have walked in that room without moving some of those items?
>
> A. Yes, I could have walked in it, yes.
>
> Q. Could you have searched during the course of the search for the narcotics — would the officers have moved some of these items anyway, as part of their search?
>
> A. Yes, sir.
>
> Q. So then you didn't do anything that the officer — that the Federal Officers were not doing anyway as a result of their search for the narcotics?
>
> A. That is correct."

Although the federal officers may also have moved the articles in the process of searching for narcotics, the copying of the serial numbers in no way related to their search.

It is apparent that the information obtained by the county officer, which ultimately led to appellant's arrest, was the product of an illegal search, for it was outside the scope of the warrant. This information was subsequently used to obtain consent to seize the stolen item. The appearance of the valid warranted search was used prefatorily by the detective in eliciting the consent by explaining "that the stolen property was observed and verified in his home the night before by the uniformed officer." The consent to seize was premised upon an obvious belief that the search disclosing the stolen property was a valid one. Although the voluntariness test of *Schneckloth* does not in most instances compel a "knowing and intelligent waiver" formulation of *Johnson v. Zerbst*, 304 U. S. 458, the State may no more violate the Fourth Amendment by guile than by forcible entry. *Cf. Gouled v. United States*, 255 U. S. 298, 305-306. That primary taint, though not dispositive in and of itself, is indicative of a "more subtle form of coercion that might flaw his judgment", *United States v. Watson*, 423 U.S. 411, 18 C.L.R. 3051, 3055, and is nonetheless a significant factor entering into "the totality of circumstances" which we must consider in determining the voluntariness of the subsequent consent. Exercising, as we must, our independent, reflective constitutional judgment, *Walker v. State*, 12 Md. App. 684, and bearing in mind the heavy burden upon the State to justify an exemption from the warrant requirement, we do not find under all of the circumstances of this case that the consent "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U. S. at 248. We think the State has failed to meet its burden of showing that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U. S. 543, 548; *Everhart v. State*, 20 Md. App. 71, 98.

*Judgment reversed.*
*Costs to be paid by Prince George's County.*