# LEON ALBERT DENT *v.* STATE OF MARYLAND

[No. 85, September Term, 1976.]

*Decided November 5, 1976.*

548

The cause was argued before GILBERT, C. J., and MENCHINE and LISS, JJ.

*Michael S. Elder, Assistant Public Defender*, with whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

*John A. Austin, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City*, and *Mary Ann Willin, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

When does "hot pursuit," like "hot love," cool off, so as to make a warrantless search of a premises an illegal search and seizure? The answer to that question is dispositive of the principal issue in this case.

Appellant, Leon Albert Dent, was convicted by a jury in the Criminal Court of Baltimore (Dorf, J., presiding) in two cases of robbery with a deadly weapon and the use of a handgun in a crime of violence. Sentences were imposed, and it is from these judgments that this appeal was noted.

The facts as to the armed robberies are undisputed. The *modus operandi* was that of the typical "knock and rob" incident which has become so prevalent in our modern urban society: Responding to a ring of his doorbell, Thomas Beverly opened the door to two male strangers who identified themselves as insurance representatives and asked for an individual unknown to Beverly. After being told that this individual did not live at that address, the strangers left. A few minutes later the bell rang again, and when Beverly in response opened the door, the same two men pushed their way into his house at gun point. Beverly testified that one of the men grabbed him while the other began to beat his wife; he was forced to the second floor of

the premises, ordered to turn over $150 in cash and his car keys, and then he and his wife were bound and forced to lie on the floor (on the first floor, to where he had been returned). The robbers were heard moving around the house for about 30 minutes; and when the noise subsided, Mrs. Beverly managed to free herself from her bonds, discovered that the intruders were gone, and untied her husband. The police were called, and their investigation revealed that an Admiral console color television set and Mr. Beverly's car had been taken. In the course of their search, the police found two pairs of gloves, two masks, a loaded revolver, a bag, some rope and a blue denim jacket, which had been left behind by the robbers.

The following day, in an effort to identify the culprits, the police submitted a series of photographs to the victims: Mr. Beverly was unable to make any identification and his sole contribution to the investigation was to give the police a description of the clothing worn by the assailants. Mrs. Beverly was able to identify one of the photographs as that of the robber who had the gun. That person was the appellant. Neither of the Beverlys was able to identify the other robber.

In one of the pockets of the jacket found on the premises, the police discovered a handwritten note of an address and the name and telephone number of a woman. The police learned in a conversation with this young lady that she had recently met a man named Leon who fit the description of one of the alleged robbers and that she had visited him at an address on Midwood Avenue in Baltimore City.

About 5 p.m. that afternoon (some 30 hours after the robbery) the police went to the Midwood Avenue address, and Detective Moran, one of the detectives engaged in the investigation, went up to the second floor apartment and knocked on the door. He testified that he heard a "scuffling noise" coming from the apartment, and shortly thereafter, he was advised that the appellant had been arrested while running toward a gate in the rear of the premises. Moran then went to the first floor and basement of the house in an effort to gain admittance to the second floor apartment

through a common stairway leading from the basement to the second floor. Both doors were locked. Moran, "feeling there was another subject in the apartment, wanted to get entrance into that apartment." Because he did not want to break the lock, he called for an emergency vehicle with a ladder. One of the officers was then instructed by Moran to climb through the open second floor window and unlock the door. Upon gaining entrance, a search of the premises was made, but no second subject was found. Moran, at the trial, was asked by the State to describe how the apartment was furnished. Defense counsel objected on the ground that the entry to the apartment was illegal. The objection was overruled, and Moran was permitted to testify as follows:

> "(By Miss Willin) Q. What were the furnishings in the apartment that you observed?
>
> A. It was a bed, rather a mattress in the bedroom. Also a television in the bedroom, a floor model color television. The kitchen had I think one on the table, a couple of chairs and there was a sofa. There was a chair in the living room, very scarcely furnished.
>
> Q. What was the make of the floor model color television?
>
> A. Admiral color television.
>
> Q. What was the description of it?
>
> A. Mahogany type of wood, wood console."

Moran, believing the television set to be the one stolen from the Beverlys, returned to the police station and obtained a duly executed search and seizure warrant. Upon returning to the apartment, the police matched the serial number obtained from the Beverlys with that on the television set, and the officers seized the set. Photographs of the set were offered by the State and over objection by defense counsel were admitted into evidence. In overruling the objection, the trial court opined:

> "No, they were on the premises under fresh pursuit. They have a right to be on the premises. At

that time, there was something in their clear view, within the clear view doctrine. The question was a right to seize it at that time. They went back and got a search warrant and checked it out. I find the search warrant was legal."

Appellant urges that the trial court erred in admitting evidence seized pursuant to a search warrant when the affidavit in support of the warrant was based on information obtained as a result of an illegal, warrantless search of the appellant's apartment. We agree and shall reverse.

The point of departure in any case involving a warrantless search of a constitutionally protected area was articulated in *Coolidge v. New Hampshire*, 403 U. S. 443, 454, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971):

"Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be a 'showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'

'[T]he burden is on those seeking the exemption to show the need for it.' " (footnotes omitted).

In order to sustain a warrantless intrusion into a dwelling, the State must demonstrate not only probable cause but also that the search falls within one of the "few specifically established and well delineated exceptions" to the general rule prohibiting warrantless searches. *Katz v. United States*, 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). Included among these exceptions are the "hot pursuit" exception, *Warden v. Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967), and "plain view" doctrine, *Coolidge v. New Hampshire, supra.* See also *Davis v. State*, 236 Md. 389, 204

A. 2d 76 (1964). It is upon these two exceptions that the trial court relied in admitting into evidence the testimony concerning the Admiral television set.

In *Warden v. Hayden, supra,* an armed holdup man robbed a cab company and fled. He was followed by two cab drivers who observed him enter a house. *Within minutes* the police arrived and were admitted into the house by one of the residents. Various pieces of evidence were found in the house. The Court held that neither entry without warrant to search for the robber nor the subsequent seizure of physical evidence without warrant was invalid. Under the circumstances "the exigencies of the situation made that course imperative." *McDonald v. United States,* 335 U. S. 451, 456, 69 S. Ct. 191, 193, 93 L. Ed. 153, 158 (1948).

The Hayden Court said at 298:

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them to effect an escape."

In *Fellows v. State,* 13 Md. App. 206, 283 A. 2d 1 (1971), this Court held that where police arrived at the scene of a fatal stabbing and robbery and observed a fresh pool of blood and bloody footprints leading to the third floor of a building, their entry into the third floor apartment and discovery of a pair of bloody pants in a closet fell within the "hot pursuit" exception.

In *United States v. Holland,* 511 F. 2d 38, 46 (6th Cir. 1975), a divided Court upheld the warrantless search of a home within an hour after a bank robbery. Admitting that the case was "not without difficulty in constitutional terms," the Court sustained the search under the "hot pursuit"

doctrine. The majority opinion, however, included the following caveat:

> "As indicated above, we feel the facts herein fell within the *Hayden* "hot pursuit" rationale; but the case is close enough to allow for some reasonable concern about that conclusion. We observe, however, that we regard this case as very near the outer perimeter of the Hayden doctrine, albeit still within it."

Appellant contends that in order for the "hot pursuit" rationale to apply, the pursuit must be both immediate and uninterrupted. The State urges that the proper time frame for determining exigent circumstances does not begin when the offense is committed but rather when the investigation has revealed the location of the suspected offenders. It offers in support of its contention *Nilson v. State*, 272 Md. 179, 321 A. 2d 301 (1974); *Dorman v. United States*, 435 F. 2d 385 (D.C. Cir. 1970); and *United States v. Harris*, 435 F. 2d 74 (D.C. Cir. 1970). We are not prepared to accept either contention in its entirety. We believe the more acceptable rule is that the facts of each case must be the standard by which the existence of exigent circumstances must be measured. It is by this standard that we find the State's position untenable.

The cases cited by the State in support of its position are factually inapposite to the case we are considering. In *Nilson, supra,* at 184, Chief Judge Murphy related the facts which led to the conclusion that the case fell within the "hot pursuit" doctrine:

> "Indeed, as the evidence so dramatically reveals, *within minutes after the crime was committed,* the police were closely monitoring the movements of the suspected felons and the information which they received led unmistakably to the apartment house at Callow Avenue, and particularly to apartment 12. The police had general descriptions of the three robbers. *They knew that at least three*

*men were then in apartment 12 — the same three that earlier that morning had driven off in the white Peugeot, a vehicle previously identified as having been used by the robbers.* That one of the robbers was named McCoy was deemed likely because a ticket bearing his name and his Callow Avenue address was found in the stolen Pontiac which was used as the getaway car. Sergeant Shriner's observation upon requesting entry to apartment 12 that Campbell fit the general description of one of the robbers added materially to the probable cause then possessed by the police." (emphasis supplied).

In *Dorman, supra,* at 388, the issue was stated to be:

"[W]hether the police acted unreasonably, and in violation of constitutional rights, when they proceeded, in furtherance of their objective to arrest a suspect they had probable cause to believe was an armed felon, to make a warrantless, unconsented *non-forcible entry* into his home late in the evening, *at a time some few hours after the offense* and within an hour after they obtained eyewitness identification of the suspect, *and when a magistrate was not readily available."* (emphasis supplied).

The Court noted:

"Terms like 'exigent circumstances' or 'urgent need' are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant, and that it is only in the light of those circumstances and that need that the warrantless search meets the ultimate test of avoiding condemnation under the Fourth Amendment as 'unreasonable.' "

The *Dorman* Court distinguished a "close running hot

pursuit which cannot brook even a delay of minutes" from "an investigation that required a visit to a police central office . . . and thereby facilitated access to the chambers of a judge or commissioner." The search in *Dorman* was not upheld on "hot pursuit" grounds. The Court said, at 393:

> "[T]he entry after 10 p.m. came some four hours after the offense. This was not a case of hot pursuit unless that term is to be stretched beyond all reasonable meaning. But the ultimate underlying factors were similar to those involved in a case of hot pursuit."

Instead of "hot pursuit", the Court justified the entry as an effort to effect the arrest of a named person who had been positively identified as one who had committed a crime of violence.

In *United States v. Harris, supra,* a payroll delivery was held up; and the getaway car, which was identified and linked to the defendant, was found near Harris's home, with the engine still warm. Police rapped on the door of Harris's apartment and identified themselves. The person opening the door resembled one of the robbers. From the opened door, the police observed stacks of coins and a pistol on a table. The Court did not rest its finding on "hot pursuit;" rather it held at pages 80 and 83-84:

> "At the moment the door was opened [by the suspect who fit the description of one of the robbers] and the probable loot from the robbery was unveiled, the officers were face to face with prime suspects and concatenately supplied with sufficient probable cause to arrest these suspects.
>
> \* \* \*
>
> The search then was a search incident to a lawful arrest . . . based on probable cause . . . ."

The facts in the case *sub judice* clearly established the following: Only the appellant had been tentatively identified as a participant in the robberies; the identity of the second

robber was unknown; the information from the female informant placed the appellant in the house on Midwood Avenue, but there was no designation of the second floor apartment as being the apartment of appellant; appellant was arrested outside the house and there was no information at that time suggesting that he had been in the second floor apartment; there was no evidence that a second person was in the apartment other than a "scuffling noise" allegedly heard by Detective Moran and his own "feeling" that someone was there; there was no information to indicate that a second person, if present, was involved in the robberies committed more than 30 hours previously.

We hold that the entry of the police into the apartment was an illegal warrantless intrusion justified neither by the "hot pursuit" doctrine nor any other exigent circumstances.

Appellant urges that the information gained by the illegal police activity should not have been used to provide the factual basis for a probable cause affidavit used to secure a search and seizure warrant for the second floor apartment premises.

Our Court of Appeals in *Everhart v. State*, 274 Md. 459, 481-482, 337 A. 2d 100, 113 (1975), said:

> "The doctrine of the 'fruit of the poisonous tree' extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search, . . . .
>
> * * *
>
> [I]f the defendant established that the evidence resulted from an unlawful search and seizure such evidence cannot be used at all unless the prosecution can convince the trial court that it had an independent origin or that the information gained in the unlawful search did not lead directly or indirectly to the discovery of the challenged evidence." See also *Garrison v. State*, 28 Md. App. 257, 345 A. 2d 86 (1975).

In *Wilson v. State*, 30 Md. App. 242, 248, 351 A. 2d 437, 441 (1976), we said:

> "[W]hen information serving as a basis for probable cause was obtained or derived as a result of an illegal search, the doctrine of the 'fruit of the poisonous tree' . . . applies to preclude the use of such information as the basis of a search warrant."

In its affidavit to support its request for a search and seizure warrant, the State included the information concerning the Admiral television set found on the premises; it has offered no evidence to suggest the existence of an independent source for that information. Our own review of the affidavit convinces us that without such information, no probable cause was stated which would justify the issuance of the warrant for the second floor apartment at this address.

The "plain view" doctrine is of no assistance to the State in justifying the admission of the evidence as to the television set which was the result of the initial warrantless search. In order for the doctrine to apply, the observation made by the police must be the result of a prior valid intrusion and the discovery of the evidence in plain view must be inadvertent. *Coolidge v. New Hampshire, supra*; *Brown v. State*, 15 Md. App. 584, 292 A. 2d 762 (1972). The State failed to establish the existence of either of these prerequisites.

As our reversal will require a new trial, we shall briefly consider appellant's other contentions: He suggests 1) that the trial court erred in failing to conduct a separate hearing as to the voluntariness of two inculpatory statements made by him while in police custody, and 2) that the statements were the product of an illegal custodial interrogation. We find no merit in either contention.

Appellant, after his arrest, complained of a leg injury. Detective Moran looked at the leg to make certain there were no serious abrasions, cuts or swelling, and he asked appellant how he hurt his leg. Appellant replied, "You know

how I hurt my leg, I jumped out of the window." Later, while appellant was being escorted to the cell block at the police station, he is alleged to have asked Detective Moran, "Would it help me any if I told you who the second man was?" The Miranda litany had not been given prior to the statements made by the appellant. *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

In *Cummings v. State*, 27 Md. App. 361, 341 A. 2d 294 (1975), this Court pointed out that there are two conditions precedent which must be met before the question of the necessity for the Miranda warnings is considered. These are that the statement must have been made 1) while the defendant was in custody and 2) in response to interrogation. While it is true appellant was in custody, there was no interrogation within the meaning of *Cummings*. It is clear that the statements in question were not made in response to an interrogation concerning the facts and circumstances of these crimes. The first was made in response to the detective's effort to determine the cause of appellant's ailment; the answer, while inculpatory, was obviously voluntary. The second statement was an effort by the appellant to determine whether his cooperation with the police would be beneficial in resolving his difficulties. Neither statement could even remotely be considered coerced self-incrimination. As these statements were not made in response to interrogation, the adequacy of the Miranda warnings or their waiver are irrelevant. There being neither compulsory self-incrimination nor a custodial interrogation, it was unnecessary for the trial court to hold a preliminary hearing out of the presence of the jury. *Barnhart v. State*, 5 Md. App. 222, 246 A. 2d 280 (1968).

> *Judgments reversed and case remanded for new trial.*
> *Costs to be paid by the Mayor and City Council of Baltimore.*