BESSIE LOUISE JOHNSON *v.* STATE
OF MARYLAND

[No. 573, September Term, 1975.]

\* \* \*

OSCIE WALKER JOHNSON *v.* STATE
OF MARYLAND

[No. 575, September Term, 1975.]

*Decided February 26, 1976.*

The cause was argued before Morton, Gilbert and Lowe, JJ.

*Theodore A. Miller* and *David L. Prestemon* for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Steven A. Shaw, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

"The precise question in this case, then, is what must the prosecution prove to demonstrate that a consent was 'voluntarily' given." *Schneckloth v. Bustamonte,* 412 U. S. 218, 223.

Oscie Walker Johnson and his wife, Bessie Louise Johnson, were convicted by a jury of the Circuit Court for Montgomery County of possession of heroin in an amount sufficient to indicate an intent to distribute it. The heroin and paraphernalia were found in their Montgomery County apartment as the result of a search by police officers. The search of appellants' apartment and the subsequent seizure of the evidence found therein, which piovided the basis for appellants' convictions, was predicated upon a consent given by Oscie Johnson immediately prior to the search while in custody.

The circumstances of Oscie Johnson's arrest, less than an hour before his consent was obtained, is an important factor in the "totality of all the circumstances" by which the voluntariness of the consent is to be determined,

*Schneckloth, supra*, 412 U. S. at 227. However, contrary to appellants' assertion, the illegality of an arrest does not itself make all consents resulting therefrom involuntary. *Cf. United States v. Watson*, 423 U. S. 411, 18 Cr. L. 3051; *Whitman v. State*, 25 Md. App. 428. The legality or illegality of a custodial holding is but one element to be considered in determining the voluntariness of the consent. More determinative of the question are the actual circumstances surrounding the arrest. A custodial consent derived from a telephone request to an accused asking him to come to a police station and submit voluntarily to police custody, is far less suspect than a consent resulting from an arrest at gun-point by several carloads of police officers armed with shotguns. Whether either arrest was legal or illegal is a factor in the equation, but the "heightened possibilities for coercion", *Schneckloth v. Bustamonte*, 412 U. S. at 240, n. 29, derive more from the particular custodial atmosphere than from whether the arrest conformed to the technical standards of legality. The *Wong Sun*[1] doctrine that the illegality of the arrest poisons its fruits [2] may affect the flavor of the consent, but does not render it poisonous in all circumstances. *Wilson v. State*, 30 Md. App. 242 (1976).

It is hard to imagine a more coercive atmosphere than appears from the facts of the instant case. While under

---

1. Wong Sun v. United States, 371 U. S. 471.
2. Since this appeal, the question of the retroactivity of Everhart v. State, 274 Md. 459, and Brown v. Illinois, 422 U. S. 590, 45 L.Ed.2d 416, applying Wong Sun, *supra*, to Maryland has been decided by this Court. In Re Appeal No. 245, 29 Md. App. 131 (1975), Judge Orth explained in his ninth footnote:

"Neither Brown v. Illinois, *supra*, nor Everhart v. State, *supra*, mentioned the question of retroactive application of their respective decisions. It is manifest, however, from the mandate of the Supreme Court to us in Ryon [45 L.Ed.2d 705], that *Brown* is to apply, at the least, to cases not finally litigated at the time of the *Brown* decision. We said in Greene v. State, 11 Md. App. 106, n. 1, at 111 (1971), that a case is finally litigated when the time for direct appeal expires without an appeal having been taken, or if an appeal has been made, the date on which certiorari was denied by the Supreme Court of the United States, or the time to apply for certiorari has expired without application having been made."

See also Wilson v. State, *supra*, 30 Md. App. 242.

surreptitious surveillance by four plainclothes officers in two unmarked police cars, Oscie Johnson and an associate left his Montgomery County apartment about midnight and entered his automobile. They drove into Prince George's County on East-West Highway followed closely by the two unmarked police cars. When appellant stopped at a red traffic light, one police car pulled behind him and the other next to him. Two officers in plainclothes armed with shotguns started out of their cars toward Johnson's car. Johnson accelerated rapidly although the signal was still red and the unmarked cars, joined by a marked police car, followed him through the intersection. They apprehended him within fifty yards. Johnson was covered by shotgun wielding officers at the front and side windows of his car. He and his associate were taken from the car, forced to assume the customary spread-eagle position and searched.[2A] Suspected narcotics were found on Johnson and in his car.

---

**2A.** It should be clearly understood, however, that we are in no way critical of police officers approaching persons reasonably suspected of criminal activities cautiously, and even with weapons in hand. Our opinion is concerned solely with the atmosphere in which a consent to search is obtained which may be completely in contrast to recommended police procedure during a lawful arrest.

No facts were elicited at the supression to provide the probable cause necessary to show a proper arrest, let alone one conducted in the manner evident here. Straining to fill that void, the State argued on appeal that the arrest was lawful because when the two officers armed with shotguns approached appellant at the red light, they were properly doing so pursuant to Md. Code, Art. 66½ § 6-112:

"Every licensee shall have his license in his immediate possession when driving a motor vehicle upon the highways of this State, and shall display it upon demand by a uniformed police officer, and the licensee shall have endorsed thereon in the proper handwriting of the licensee the name of the licensee; and when requested by a proper officer in the discharge of his duties under the law the licensee shall write his name in the presence of the officer to the end that the identity of said licensee may be determined. No license shall be valid unless the name cᶠ the licensee has been so endorsed. For the purposes of this section display means the manual surrender of the licensee's license certificate into the hands of the demanding officer for his inspection."

When appellant, faced with the armed officers' approach, ran the red light, his violation of the law provided the probable cause for arrest according to appellee.

In the first instance the approaching officers were not "uniformed" which

Appellant's hands were then manacled behind his back and he was placed in the back seat of a police car. Three or four officers were in the vehicle with him and others, including uniformed officers, remained outside. Within fifteen minutes of his arrest, appellant verbally consented to a search of his apartment. Plainclothes State policemen were summoned to the scene. Upon arrival, between thirty and forty-five minutes later, one State policeman entered the car with a written consent form and asked appellant if he would sign it. After receiving an affirmative response, he advised appellant that if more narcotics were found in his home they would be used to bring charges against him in Montgomery County. The State policeman in charge of the case also advised appellant that he could withdraw his consent at any time. Johnson's handcuffs were unlocked, so he could sign the consent form, and then refastened.

The procession of police vehicles then proceeded to the Johnson's home. When they arrived there, Oscie explained to his wife that he had consented to a search of the premises. The two Johnsons were seated on the sofa and, at Bessie Johnson's request, were permitted to be joined by their young daughter. The search revealed substantial narcotics and paraphernalia.

Appellant's testimony differed little from that given by the police officers. His descriptions were more varied and certainly more detailed. Although Oscie Johnson was not able to say specifically which officer did what, he did testify that the two officers who apprehended him identified themselves as "Batman and Robin."

> "Q Do you recall which officer went around to the passenger side of the car?
>
> A No. All I was looking at was at the shotgun. I wasn't looking at the officers."

---

is a prerequisite of the statute. Beyond that, it strains our credulity to think that members of our law enforcement agency would approach a vehicle stopped at a red light on a highway after midnight, with shotguns, for the purpose of asking the driver to display his license. Even if appellant had been an innocent autoist, instead of a possessor of narcotics, it was not unreasonable for him to hastily depart a scene where men dressed as civilians approached, armed with shotguns.

His detailed recollection of the arrest was not rebutted, but might have been disbelieved by the trial judge. He testified that when he was stopped after going through the red light:

"A Two officers jumped in front of my car, and I saw them. I guess they cocked the shotguns, pointed them directly at my windshield, and I put my hands up.

Q What was said at that time?

A They walked around to the side of the car and they asked me, told me to get out of the car. The car wasn't in park and I was scared to move my hands to put it in park.

Q Is that what you said to them?

A Yes.

Q What did they say?

A They reached in and put it in park.

Q Then what happened?

A I proceeded to get out of the car.

Q Were there any guns pointed at you at this time?

A Yes.

Q What kind of guns?

A Revolvers and two or three shotguns.

Q How close was the closest shotgun to your head?

A A shotgun was on my neck.

Q Literally on your neck?

A Touching my neck, both of them.

Q What did you do then?

A He asked me to run and, well, the shotgun was pointed at my head. The officer that just testified said, 'This is a hairpin trigger I got. You can breathe hard if you want to.' I asked him to remove the shotgun from my head.

Q Then what happened?

A The officer standing across from me with the pistol on the other side of the car, the officer across the car, the officer behind me, I don't know how many were behind me, that is about it.

Q Well, all right, did you have your hands on the car?

A Yes."

He admitted that he was advised fully of his rights in accordance with *Miranda v. Arizona*, 384 U. S. 436, and warned that he need not consent to the search of his home. However, he denied being told he had the right to be taken to a court commissioner forthwith to be formally charged. When asked why he consented, he assigned various reasons, two of which he articulated upon cross-examination:

"Q You consented to the search because you didn't think they would find anything?

A I knew they wouldn't find anything.

Q That is the reason you signed the form, though; isn't that right? You didn't sign it because you figured they would kick the door down?

A They said they would kick the door down.

MR. DONOHUE: I object.

MR. SHAW: If I can finish the sentence, that is all I am trying to do.

THE COURT: Re-state your question.

BY MR. SHAW:

Q You didn't sign the consent form because you thought they were going to kick down the door anyway; that is not the reason?

A That is one of the reasons. I misunderstood your question.

Q That was your reason?

A That was one of the reasons.

Q How many reasons did you have?

A For one reason, I knew there weren't any narcotics in my house. It didn't make any

difference whether I signed it or not, I had my girl there, little girl there and I didn't want them kicking down the door.

Q How many reasons did you have for signing it?

A I didn't see any reason not to."

It was upon this testimony that the trial judge denied appellants' motions to suppress.[3] The court stated:

"In any event, considering all the facts presented at the suppression hearing, and following the guidelines set down in the *Schneckloth* and *Lopata* [18 Md. App. 451] cases, the Court finds that the consent of defendant Oscie Johnson to search the premises at 7406 Hancock Avenue was freely and voluntarily given and the subsequent search and seizure of evidence was valid."

In *Whitman v. State*, 25 Md. App. 428, we adopted the procedure prescribed by *United States v. Hearn and Taylor*, 496 F. 2d 236 (6th Cir.), of isolating the factors of coercion and non-coercion and placing them in juxtaposition in order to determine the voluntariness of a consent search. The elements of coercion in the case at bar completely counterbalance the non-coercive acts of the police. The fact that appellant admitted he was given his *Miranda* warnings and told he had the right to refuse consent to the search of his home are certainly non-coercive factors. See *Schneckloth v. Bustamonte, supra,* 412 U. S. at 226. We add to the positive side of the scale the trial judge's finding that appellant saw no reason not to consent because there was nothing to find. We do not regard these factors as so compelling as to outweigh the melodramatic atmosphere of Johnson's midnight apprehension at gun-point followed by his confinement to the back seat of a police car with his hands manacled behind his back. Nor do we believe that the time period between the first verbal consent and the written consent signed while still in the same atmosphere (though

---

**3.** The State and appellants agree that the convictions of both appellants stand or fall on the validity of the consent.

not then at gun-point) vitiated the appalling circumstances of Johnson's arrest so as to add any weight to the non-coercive side of the scale. If the totality of these circumstances are not coercive, we can find little meaning in the test espoused in *Schneckloth v. Bustamonte, supra,* that:

> " . . . whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U. S. at 227.

## Who Decides Voluntariness

Because we shall remand for a possible new trial, we feel compelled to respond to another of appellants' tangential complaints. Appellants argue that the same procedure should be used in determining the voluntariness of a consent to search as in determining the voluntariness of a confession. The procedure used when the latter is at issue is that:

> " . . . the court has the preliminary decision whether or not the confession was voluntary and the trier of facts has the final determination. . . ." *Barnhart v. State,* 5 Md. App. 222, 223.

Although appellants' argument is beguiling, the application of such a procedure to the consent to search issue has not been accepted by this Court, nor by the Court of Appeals since the adoption of Md. Rule 729. Prior to that rule's adoption, however, in *Hubbard v. State,* 195 Md. 103, 107, the Court of Appeals spoke directly to this question.

> "In a case like this, where the traverser testifies that the search was made over her objection, and the police officers testify that she permitted them to make the search, whether the fruits of the search should go to the jury is in the first instance a matter for the court. If the court is of the opinion that the accused freely and voluntarily consented to

the search, and there was no coercion or fear
brought to bear upon the traverser by the police,
the matter should be submitted to the jury, and it is
then for the jury to say, on all the facts, whether
the traverser waived her right she might have to
object to the search."

See also *Payne v. State*, 207 Md. 51, 54-55 and *Wilson v.
State*, 239 Md. 245. *Hubbard* was decided on April 14, 1950,
before the Supreme Court had ruled that the Fourth
Amendment guarantee against unreasonable searches and
seizures was applicable to the states through the due process
clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.
S. 643 (1961).

In June of 1965, the Court of Appeals, relying on *Hubbard*
and *Payne*, both *supra*, held in *Wilson v. State*, 239 Md. 245
that counsel was entitled to argue to the jury the question of
voluntariness of a consent to search (as well as the legality
of an arrest).

"We think the judgment must be reversed
because the trial judge erred when he prevented
defense counsel from arguing to the jury the
questions whether the appellant had voluntarily
consented to the searches and seizures, or whether
his apparent acquiescence had been induced by an
unlawful arrest. Whether these were questions of
law or of fact, or a combination of both, they were
within the domain of the jury and counsel was
entitled to discuss the facts relative thereto and
inform the jury of the applicable law." *Id.* at 254.

Thereafter, in June of 1967, the Court of Appeals adopted
Md. Rule 729 to clarify for bench and bar the procedure to be
followed in cases wherein the question of the legality of a
search and seizure is raised. That rule, pertinent to the issue
here, provides as follows:

"a. *Scope.*

This Rule shall be applicable whenever property
is claimed in a court to have been obtained by an

unlawful search or seizure even though the offense charged or threatened to be charged may not be within the exclusive jurisdiction of a court or even though the search warrant, pursuant to which the property was seized, may not have been issued by a court.

b. *Venue.*

1. After Indictment.

When an indictment has been filed in a court or after a defendant has been held for the action of the grand jury and property seized may be used as evidence at the trial, a motion for the suppression, exclusion or return of such property on the ground that it was obtained by an unlawful search or seizure, shall be filed in the court having criminal trial jurisdiction.

. . .

g. *Binding Effect of Pre-Trial Ruling.*

. . .

2. Where Denied.

If such motion or petition is denied prior to trial of the criminal case, the pre-trial ruling shall be binding at the trial unless the trial judge, in the exercise of his discretion grants a hearing *de novo* on the defendant's renewal of his motion or objection. A pre-trial ruling, denying a motion or petition to suppress, exclude or return property seized, shall in any event be reviewable on appeal to the appropriate appellate court or on a hearing on a motion for a new trial."

Two years later, in 1969, we held in *Price v. State,* 7 Md. App. 131, 143, that the admissibility of evidence obtained by a search and seizure warrant claimed to be invalid was a matter exclusively for the court by virtue of Md. Rule 729. In that same year, in *Cleveland v. State,* 8 Md. App. 204, 211,

we extended *Price* by holding that Rule 729 applies not only to evidence seized under a warrant but to *any* evidence obtained by search or seizure and, therefore, the admissibility of evidence obtained by *any* search or seizure claimed to be invalid is a matter exclusively for the court and should not be submitted to the jury. In explaining the rationale of this holding, however, Judge Orth (who had also written *Price*) referred to *Hubbard, supra,* and remarked:

> "Thus *Hubbard* applied as to the disputed consent to a search the same rule followed as to the disputed voluntariness of a confession and it may well be that the two issues are comparable. Each in the ultimate is a factual determination whether *the accused* acted freely and voluntarily." *Cleveland,* 8 Md. App. at 211.

Although in *Cleveland* we expressly declined to decide the impact of Rule 729 on the holding of *Hubbard, Payne* and *Wilson* as to the respective functions of the court and jury on the question of a consent to a search, we questioned their holdings and at the same time declared our opinion that in light of Rule 729 *Wilson* was no longer the law regarding the question of legality of an arrest to the extent that arrest related to admissibility of evidence seized. No other case in Maryland has since raised the question or discussed the issue of whether voluntariness of consent was a court and/or a jury question.

Clasping at the comment in *Cleveland* appellants argue that because *Schneckloth* uses the same standard to determine both voluntariness of consent to search and of confessions, the same procedure should be followed as to each, *i.e.,* a preliminary determination of voluntariness by the court and the ultimate decision by the jury using its "beyond a reasonable doubt" standard. This reasoning is persuasive but not sound since a similar paradigm may apply for the opposite view. As pointed out in footnote 6 of *Schneckloth,* the Supreme Court also uses the same test of voluntariness for a guilty plea as it does for a confession. See *Brady v. United States,* 397 U. S. 742, 749. Yet the

voluntariness of a guilty plea is necessarily determined solely by the judge before he accepts it. *Holloway v. State*, 8 Md. App. 618, 620; *McCall v. State*, 9 Md. App. 191, 195.

We are not convinced that the Court of Appeals intended to exclude consent searches from the purview of Md. Rule 729. In every other instance the authority to conduct the search, *e.g.*, warrant, arrest, plain view, stop and frisk, etc., is at the very heart of the question of admissibility. *Cf. Wilkins v. State*, 11 Md. App. 113, 116-117. We see nothing in Md. Rule 729 to indicate that the Court of Appeals intended that it not apply to consent searches. The reasoning behind the rule as set forth in *Cleveland v. State*, 8 Md. App. at 209-211, applies to the issue of *admissibility* of evidence, however obtained, and answers directly the similar standards argument posed by appellants:

> "It may appear, at first glance, that the question of the legality of a search or seizure is comparable to the question of the voluntariness of a confession and that since the ultimate determination of the voluntariness of a confession is for the jury, so should the ultimate determination of the legality of a search or seizure. But we noted in *Price*, at 143, that the matter of the admissibility of evidence claimed to have been unlawfully seized is to be distinguished from the question of the admissibility of a confession, where the question of its voluntariness is first determined by the court and upon being found voluntary and thus admissible, the evidence as to its voluntariness is then submitted to the jury. See *Barnhart v. State*, 5 Md. App. 222. This is so because of the fundamental difference between a confession and evidence obtained by a search and seizure. The weight to be given any evidence, be it a confession or otherwise, is for the trier of fact. Even if a confession is ruled by the court to be *prima facie* voluntary and thus admissible, it is the function of the jury whether or not to believe it. *Day v. State*, 196 Md. 384, 399. The voluntariness of the confession is an indispensable

factor in the determination of whether or not it is to be believed. Its integrity would be seriously affected were it obtained by coercion or threat, or improper inducement or without the assistance of counsel whose presence was not properly waived. Thus, in order for the jury to give weight to a confession, that is to ascertain whether it was true, so as to properly consider it in arriving at the guilt or innocence of the accused, they must have before them the evidence as to its voluntariness. Because the voluntariness of a confession is essential to the jury's function in ascertaining guilt or innocence even when it is properly submitted to them, its voluntariness is a question of fact to be found by the jury beyond a reasonable doubt before they may consider it. *Barnhart v. State, supra,* at 225. In other words the voluntariness of a challenged confession is an essential element of the State's case and must be established by it beyond a reasonable doubt once the confession is shown to be admissible by *prima facie* proof that it was voluntary. On the other hand, the integrity of evidence obtained by a search and seizure is not affected by the reasonableness *vel non* of its seizure. Once the trial court has found it to be admissible (this finding upon proper challenge is reviewable on appeal, Md. Rule 729 f), whether or not it was seized under a valid search warrant, or incident to a valid arrest or by a search and seizure otherwise reasonable, plays no part in the weight to be given it. The reasonableness of the search or seizure by which evidence was obtained is not an essential element in arriving at guilt or innocence; the resolution of the question of reasonableness merely determines whether the evidence shall or shall not be submitted to the jury and once this is determined by the court there is nothing for the jury to consider with regard to its admission. Thus the reasonable doubt standard is not applicable; the rule of probable cause in determining the legality of

a search or seizure is, as the term indicates, one of 'probability.' See *Hall v. State,* 5 Md. App. 394, 396-398; *Gaudio and Bucci v. State,* 1 Md. App. 455, 463-464. In short, the validity of a search or seizure relates only to the admissibility of the evidence obtained thereby and is no more for the determination of the jury than are other matters pertinent to the admission or exclusion of evidence otherwise obtained. Therefore, that the jury judge the law as well as the facts, plays no part, just as it plays no part in the determination of the admission of any other evidence. (Footnotes omitted).

The trial judge was correct in not submitting the question of consent to the jury. We hold that "whenever" suppression is sought based on the illegality of a search and seizure, consensual or otherwise, the question of admissibility and all tangential questions related thereto are exclusively for the court. It need hardly be added that he need only be convinced by a preponderance of the evidence that the consent to seize was voluntarily given in order to admit the evidence.

### Mandate

We conclude as did Judge Moore in *Whitman, supra,* 25 Md. App. at 457:

"Additional probative evidence with respect to the legality of the search may be available to the State. Therefore, we shall remand for a new trial. Upon remand, the State will bear the burden of demonstrating to the satisfaction of the lower court that it can produce additional probative evidence. Such evidence shall be presented within such time as may be authorized by the lower court. If the lower court is satisfied with the presentation by the State, it shall hold a new trial; if not, it shall enter a judgment of acquittal. See *Gray v. State,* 254 Md.

385, 255 A. 2d 5 (1969); *Smith v. State*, 8 Md. App. 163, 258 A. 2d 755 (1969)."

*Judgments reversed; case remanded for a new trial; costs to be paid by Montgomery County.*