KENNETH EDWARD EHRLICH, JR. *v.* STATE OF MARYLAND

[No. 1086, September Term, 1978.]

*Decided July 9, 1979.*

The cause was argued before MOYLAN, WILNER and COUCH, JJ.

*Joel Marc Abramson,* with whom were *Talkin & Abramson* on the brief, for appellant.

*William H. Kenety, V, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William Hymes, State's Attorney for Howard County,* and *A. Gallatin Warfield, III, Assistant State's Attorney for Howard County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The conviction of the appellant, Kenneth Edward Ehrlich, Jr., by a Howard County jury, presided over by Judge Guy J. Cicone of 1) possession of cocaine, 2) possession of marijuana and 3) possession of marijuana with intent to distribute raises four related search and seizure questions — one going to the merits of the Fourth Amendment and three going to procedural questions for the handling of those merits.

The ultimate issue of guilt or innocence is beyond dispute. The police seized from the appellant's person and from the trunk of the appellant's automobile, at a time when it was occupied by him, 1) cocaine and 2) marijuana in sufficient quantity reasonably to indicate an intent to distribute it. The

entire case hinges upon the constitutionality of that second seizure and upon the procedures employed to litigate that constitutionality.

## 1. The Fourth Amendment Merits

At the conclusion of the pretrial suppression hearing, Judge Cicone ruled that the warrantless search of the appellant's automobile and the seizure of the contraband therefrom was constitutional under the Carroll Doctrine exception to the warrant requirement. Two conditions must, of course, coalesce to engage the gears of the Carroll Doctrine: 1) probable cause to believe that the automobile (or equivalent) contains evidence of crime and 2) exigency, to wit, a danger that the automobile and its evidentiary contents may disappear if the police do not seize the investigative current as it serves. *Carroll v. United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *Chambers v. Maroney,* 399 U. S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970); *Coolidge v. New Hampshire* (Part IIB), 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971); *King and Mobley v. State,* 270 Md. 76, 310 A. 2d 803 (1973); *Soles v. State,* 16 Md. App. 656, 299 A. 2d 502 (1973). Before focusing in upon the satisfaction of those two conditions, one immaterial issue, raised by the appellant, can be quickly cleared away. The appellant takes pains to point out that he was in the police cruiser when the warrantless search of his automobile took place and that the locus of the search was beyond his "reach, lunge or grasp," citing *Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), and *Howell v. State,* 271 Md. 378, 318 A. 2d 189 (1974). That fact, of course, is utterly immaterial. Judge Cicone explicitly, and quite properly, ruled that the warrantless search here was constitutional not under the search-incident-to-lawful-arrest exception to the warrant requirement but under the very distinct Carroll Doctrine exception. Such factors as 1) lawful arrest and 2) the reach-lunge-or-grasp perimeter have no bearing at all upon the Carroll Doctrine. Having put aside the immaterial, we turn to the exigency requirement of the material.

## A. Exigency:

The circumstances here were the very paradigm of exigency. The appellant first came to the attention of the arresting officer when his car lurched onto the parking lot of the California Inn in Laurel at approximately 11:30 p.m. on Sunday evening, July 3, 1977. Moments later, the appellant was arrested for driving while under the influence. It was only as the person of the appellant was searched as an incident of his arrest and as several other officers arrived with pertinent information, that probable cause to believe that the automobile contained drugs developed over the course of the next five to ten minutes. The critical accumulation of probable cause preceded the automobile search only by minutes.

At the moment when the critical mass of probable cause was reached, the car was on the parking lot of a tavern at approximately 11:40 at night. It was sitting not in a parking space but in a traveled lane. Its motor was running. There arrived upon the scene, moreover, just as the search was commencing, relatives of the appellant who demanded that the car be turned over to them. In terms of a threat to the probable evidence, circumstances could hardly have been more exigent. *Chambers v. Maroney, supra; Soles v. State, supra.* Exigency having clearly been established, we turn to the proof of probable cause.

## B. Probable Cause:

We hold that there was probable cause to believe that the appellant's automobile contained narcotics. No single police observation yields this result. The steady amassing of data, however, initially fragmentary and inconclusive, first yields to the inquiring mind a working hypothesis. As additional data are checked against that hypothesis, a theory emerges offering the probable explanation for the pattern of events. A probability is all that is required. *Dawson v. State,* 11 Md. App. 694, 707-712, 276 A. 2d 680 (1971); *State v. Swales,* 12 Md. App. 69, 277 A. 2d 449 (1971).

The first significant observation, by Officer Kessler who made the arrest, was that the appellant was intoxicated.

Officer Kessler first heard the loud squealing of tires and saw the appellant screech his car to a halt after bouncing over a curb. The appellant was very slow in his responses to the officer and then had trouble finding his license. As he alighted from the car, his balance appeared to be bad. The pupils of his eyes were dilated. Even though it was dark, when Officer Kessler suddenly shined his three-cell flashlight directly into the appellant's eyes at point-blank range, the appellant's pupils did not constrict. At that point, intoxication was probable. The cause of intoxication, however, could have been either alcohol or drugs. Indeed, the appellant concedes the legitimacy of his warrantless arrest for driving while under the influence of either alcohol or drugs. Subsequent observations will not be viewed in a vacuum but within this context of "A or B" — "alcohol or drugs" — as we look for clues to eliminate one alternative and to indicate the probability of the other.

As we begin the process of weighing the probabilities between the two alternatives, we have Officer Kessler's initial observation that he smelled no odor of alcohol as the appellant first got out of his car. Later, as they faced each other a few feet apart, Officer Kessler detected a slight odor of alcohol. Standing with Officer Kessler was Officer Fitzgerald who offered the belief within the police department that the appellant was involved in narcotics. Although not of great weight, *Spinelli v. United States,* 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969), this does nudge slightly toward the narcotics theory of intoxication, as between the two realistic alternatives. See *United States v. Harris,* 403 U. S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971); *State v. Edwards,* 266 Md. 515, 522, 295 A. 2d 465 (1972).

The decisive tie-breaking between competing theories came with the search of the appellant incident to his arrest for the driving infraction. The concession of the appellant, in appellate brief, is helpful in this regard: "The search of the Defendant's person is not questioned in this Appeal." [1]

---

1. Curiously, this search incident to lawful arrest, which the appellant does not challenge, produced all of the cocaine in this case. The appeal, therefore, does not speak to the conviction for possession of cocaine. In view of the concurrent sentences (which were, in turn, suspended), the whole point of this appeal becomes very questionable.

Recovered from the appellant's pocket was a white powder wrapped in plain paper. Officer Kessler, with extensive experience and expertise in narcotics investigations, believed that it was cocaine. He found significant, as do we, that there were no commercial markings on the wrapping paper.

Officer Kessler found seven dollars in the appellant's front pocket, a fact of no significance except that it was not co-mingled with the money found in a rear pocket. From the rear pocket was recovered $1550, carefully packaged. There were eight $100 bills, one $50 bill and thirty-five $20 bills, wrapped in groups of five each ($100 each). Although the appellant was reputed to be in the restaurant business, the denominations argue against their being the daily receipts. Nor would a responsible businessman carry such sums, so bundled, around on parking lots late on a Sunday night. Such bundling does indicate a purpose, however, and the strong possibility of a drug deal begins to emerge as a plausible purpose.

At that point, Officer Thomas arrived upon the scene. He had stopped the appellant for apparent "drag racing" only minutes before, had allowed the appellant to drive to get his missing driver's license with Officer Thomas in convoy, and had momentarily lost the appellant when the appellant swerved suddenly onto the parking lot of the California Inn. What Officer Thomas hypothesized as a drag race, however, takes on a different coloration in light of the information then available to Officer Kessler. Putting aside Officer Thomas's interpretation and going directly to Officer Thomas's observations, which he communicated to Officer Kessler, two cars — the appellant's and another — were observed poised side by side. When Officer Thomas suddenly came upon the scene, the two cars suddenly took off at a fast rate of speed. What Officer Thomas thought was a drag race was susceptible of a different explanation by Officer Kessler based upon his additional knowledge:

"A. Officer Thomas told me that there were two cars together, and that when he had appeared, they both took off as if they were drag racing. When I found the amount of money on Mr. Ehrlich that I did,

and received the information as to his being involved in the narcotics traffic, I felt that he was probably, or that there was probably a deal going down, and Officer Thomas had interrupted it.

Q. Oh, you mean when someone is drag racing—

A. No, sir, that's not what I mean.

Q. What evidence did you have that there was a deal going on?

A. I just explained that to you. Officer Thomas had seen two cars together, and when Officer Thomas appeared, the two cars had taken off. He, he had thought they were drag racing. Later, when I had stopped Mr. Ehrlich and recovered this amount of money on him, and Officer Thomas saw — I'm sorry, Officer Fitzgerald had informed me that, that he was possibly involved in dealing in narcotics, that fact plus the money, plus the fact that the two cars had been together, and had run when Officer Thomas appeared, led me to believe that that was a possibility."

We feel here as we did in *Dawson v. State, supra,* at 11 Md. App. 694, 707:

"[P]robable cause emerges not from any single constituent activity but, rather, from the overall pattern of activities. Each fragment of conduct may communicate nothing of significance, but the broad mosaic portrays a great deal. The whole may, indeed, be greater than the sum of its parts."

The various strands, possibly insubstantial unto themselves, together weave a strong web of probability. Both conditions were met for a warrantless Carroll Doctrine search of the appellant's automobile.

### 2. The Immateriality of Probable Cause to the Jury's Function

The appellant alludes to Article XV, § 5, of the Maryland Constitution, providing that "[i]n the trial of all criminal

cases, the Jury shall be the Judges of Law, as well as of fact," and uses that as his launching pad to contend that Judge Cicone was in error in precluding him from arguing the probable cause question to the jury in this case. While ingenious, the argument could not be more wrong.

This curious provision of the Maryland Constitution with respect to the jury's being judges of the law has only meant that where there are conflicting interpretations of law, the jury may have both interpretations argued to it and the jury may choose between, and further that the jury shall decide whether the law should be applied in dubious factual situations. We addressed this limitation upon the constitutional provision clearly in *Hamilton and Fletcher v. State,* 12 Md. App. 91, 98, 277 A. 2d 460 (1971):

> "Article XV, Section 5, of the Constitution of Maryland provides that 'In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact. . . .' That provision contemplates that it is within the proper province of the jury to resolve conflicting interpretations of the law and to decide whether the law should be applied in dubious factual situations. *Schanker v. State,* 208 Md. 15. It does not confer upon them, however, untrammeled discretion to enact new law or to repeal or ignore clearly existing law as whim, fancy, compassion or malevolence should dictate, even within the limited confines of a single criminal case. That limitation upon the role of the jury as 'judges of the law' is implicit in the holdings that questions of constitutionality may not be argued to a jury, *Franklin v. State,* 12 Md. 236, *Bell v. State,* 57 Md. 108, *Hitchcock v. State,* 213 Md. 273, and that questions of the admissibility of testimony and the competency of witnesses will rest within the sole province of the trial judge. *Jules v. State,* 85 Md. 305, *Deibert v. State,* 150 Md. 687, *Kirschgessner v. State,* 174 Md. 195."

In deciding which of two conflicting interpretations of law is correct and in deciding whether the law should apply in a

dubious factual situation, the jury is still carrying out its sole mission of determining guilt or innocence. Overriding limitations still abide as to what a jury shall not hear (by way of evidence or argument) and what a jury shall not do. Evidence will never be permitted to go to the jury on an immaterial issue. Argument and instructions will never be offered to the jury on an immaterial issue. The jury will never be asked to consider and to decide an immaterial issue.

In a criminal case, the only issue for the jury is that of guilt or innocence. Anything that does not bear upon guilt or innocence is utterly foreign to the only task assigned to the jury. Against this understanding of the limited function of the jury in a criminal trial, we turn to a consideration of the exclusionary rule of evidence. The exclusionary rule has no bearing upon guilt or innocence. It serves what Dean Wigmore referred to as the "extrinsic purpose" of policing the police. It does not enhance the integrity of the fact-finding process. (Indeed, it frequently derogates from that process by depriving the jury of probative evidence.) The Supreme Court has told us, since the inception of the rule, that its purpose is that of general deterrence. *Linkletter v. Walker,* 381 U. S. 618, 637, 85 S. Ct. 1731, 14 L.Ed.2d 601 (1965); *United States v. Calandra,* 414 U. S. 338, 348, 94 S. Ct. 613, 38 L.Ed.2d 561 (1974). As the Supreme Court pointed out in *Stone v. Powell,* 428 U. S. 465, 486, 96 S. Ct. 3037, 49 L.Ed.2d 1067, 1083 (1976):

> "The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. Post-*Mapp* decisions have established that the rule is not a personal constitutional right."

The role of excluding probative evidence in order to serve the extrinsic, prophylactic purpose of making the police behave is a role exclusively for the court. It has nothing whatsoever to do with the jury function. The jury is assigned the sole mission of determining "Whodunnit?" Evidence that is competent, material and relevant and which helps the jury determine the answer to that ultimate riddle comes in.

Evidence which is incompetent, immaterial and irrelevant and does not assist in answering the riddle stays out. Physical evidence — guns, bloodstains, fingerprints, contraband — is just as helpful to the jury in determining "Whodunnit?" whether the police have scrupulously obeyed the Bill of Rights or have shamelessly trampled it underfoot. The latter concern is a very real one to society at large and to the courts in administering the exclusionary rule, but it is simply not the concern of a criminal jury.

In the case at bar, all that matters to the jury is that marijuana was found in the trunk of the appellant's automobile. The existence of probable cause, which the appellant wished to argue to the jury, is immaterial to the only issue before the jury: "Did the appellant possess contraband marijuana?" Whether the police entered the trunk of the automobile with probable cause or upon the most cavalier of fishing expeditions is immaterial to the issue of criminal possession. See generally *Price v. State,* 7 Md. App. 131, 254 A. 2d 219 (1969); *Cleveland v. State,* 8 Md. App. 204, 259 A. 2d 73 (1969); *Johnson v. State,* 30 Md. App. 280, 352 A. 2d 349 (1976).

The jury has all that it can handle in determining guilt or innocence. It is not the function of the jury "to police the police" by denying itself probative evidence.

### 3. The Propriety of Letting the Judge Know What He is Being Asked to Suppress

The appellant urges further that a trial judge should never be informed of what it is that a questioned search produced and that he is being asked to suppress. The reasoning is that the judge, aware of the contraband that was possessed, will be prejudiced against the defendant and that this will effect the ruling on suppression. Our reasons for rejecting this contention are manifold.

It is well settled that a legally trained judge, unlike a lay jury, is capable of compartmentalizing his thinking and of preventing knowledge which might inflame a jury from

influencing his own decisions. *State v. Hutchinson,* 260 Md. 227, 271 A. 2d 641 (1970).

In the second place, a judge in many instances could not conduct an intelligent suppression hearing without knowing precisely what was seized. The issue in a search warrant case may be that the police seized things not particularly described in the warrant. The issue in the case of a warrantless search may be that the seizure went beyond the scope of the purpose of the warrantless search. In all cases, an appropriate suppression order must be framed, specifying what it was that was suppressed.

In the third place, the judge in a case such as this, reviewing the constitutionality of a warrantless search, is not himself determining probable cause. He is rather determining whether the policemen had probable cause at the moment the policemen initiated the warrantless search. The object recovered by the search was not available to the policemen before the search began and, therefore, would not enter into the probable cause equation.

In the fourth place, all of the testimony upon the issue of probable cause that was before the judge is before us and is susceptible to our independent, reflective constitutional review.

### 4. The Discretion to Grant or Refuse a De Novo Hearing on the Motion to Suppress

The appellant claims that Judge Cicone abused his discretion in not granting a de novo hearing on the motion to suppress. He claims that he was entitled to such a hearing for two separate reasons: 1) that Officer Kessler changed his testimony between the suppression hearing and an earlier preliminary hearing and 2) that a proffered defense expert would testify that there is no distinct odor to unburned marijuana. Neither of these subcontentions raises the remotest possibility that Judge Cicone abused his discretion.

### A. The Alleged Change in Testimony:

In the first place, the appellant has not furnished us with a transcript of the preliminary hearing, as would be his

responsibility to pursue this point. We have, therefore, no way of knowing what the testimony of Officer Kessler was at the preliminary hearing.

Even taking that testimony as the appellant alleges it to be, however, we see no error for two reasons. In the first place, the alleged testimony at the preliminary hearing did not contradict the later testimony at the suppression hearing. It was simply the case that the earlier testimony was not as full as the later testimony under more probing direct and cross-examination. It is, furthermore, quite evident that the fuller testimony produced at the suppression hearing would have been immaterial at the preliminary hearing. The fuller suppression hearing testimony, omitted at the preliminary hearing, dealt with the subject of probable cause. It is not the function of a preliminary hearing to rule upon issues of constitutional exclusion. Md. District Rule 727g. It was, therefore, appropriate that such immaterial testimony be omitted at a hearing where it would serve no purpose. It is the purpose of a preliminary hearing to take the state's case at face value and to determine therefrom whether a *prima facie* case exists to justify detaining a defendant while a grand jury or the state's attorney considers further action. At the preliminary hearing, the constitutionality of a search is immaterial; at a suppression hearing, it is the only thing that is material; at a trial upon the merits, it is again immaterial as far as the fact finder is concerned. In the second place, the alleged contradiction (even if there had been one) was fully before the court and subject to cross-examination at the time of the suppression hearing. This distinguishes it from a case like *Waugh v. State,* 275 Md. 22, 338 A. 2d 268 (1975), where the contradiction did not become apparent until after the suppression hearing had been concluded.

## B. The Alleged Expert on the Non-Distinctive Odor of Unburned Marijuana:

Officer Kessler had testified that based upon probable cause and exigency, he began to search the appellant's automobile for suspected narcotics. He began the search in the passenger portion of the automobile. He testified that

while there, he detected the strong odor of unburned marijuana. The odor was most prominent at the very rear of the passenger section of the automobile. Upon his subsequent search of the trunk, he found the marijuana which had been the source of the odor. The appellant, in asking for a de novo suppression hearing, claimed to have an expert who would testify that unburned marijuana has a plant-like odor but one which is not distinguishable from any other freshly cut vegetable substance. Upon the basis of this, the appellant now claims that Judge Cicone abused his discretion in not conducting a de novo hearing. We cannot agree, for two separate reasons.

In the first place, even if the proffered expert testimony had been material, the appellant offered no reason why such expert could not have been called at the suppression hearing. For this reason alone, we would see no abuse of discretion in denying the de novo hearing.

In the second place, the entire issue as to which the expert would have testified is immaterial. The probable cause to search the entire automobile existed before the search began and before the odor of marijuana was detected. The search of the trunk would have been appropriate whether Officer Kessler smelled marijuana or not as he searched the passenger section of the car. The probable cause to search applied to the automobile as a whole. The sequence of searching could have been from the trunk forward to the glove compartment just as well as from the glove compartment rearward to the trunk, as in this case. When probable cause exists to search the automobile, there does not have to be incremental probable cause (probable cause plus) to proceed from one portion of the automobile to the next. In view of the constitutionally sufficient probable cause at the outset, the subsequent smelling of marijuana (real, imagined, perjured, mistaken, misinterpreted, whatever) was utterly immaterial surplusage.

*Judgments affirmed; costs to be paid by appellant.*